**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:23-cr-00271 |
| v. | Hon. Christopher R. Cooper |
| SEAN WARD, *Defendant*. | Sentencing: November 30, 2023, at 10:00 AM |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS**
**POSITION WITH RESPECT TO SENTENCING**

Sean Ward, by counsel, respectfully submits this Memorandum in Support of his Position on Sentencing. For the reasons stated herein, Mr. Ward requests a probationary sentence accompanied by a reasonable restitution order. Such a sentence is consistent with the requirements outlined in 18 U.S.C. § 3553(a) and is consistent—given the unique facts of Mr. Ward's case—with other January 6 defendants who have been convicted of stand-alone misdemeanor violations of 40 U.S.C. § 5104(e)(2)(G).

**DISCUSSION**

Mr. Ward accepts responsibility for his participation in the events of January 6; specifically for his decision to enter the Capitol building that day and to linger within for roughly forty-seven minutes, thus adding to the burden of police officers and other governmental officials attempting to restore order. To that end, on August 28, 2023, Mr. Ward pled guilty to single count Information, charging him with the misdemeanor offense of Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

The issue presented here for the Court to decide in passing a sentence on Mr. Ward is what punishment is sufficient but not greater than necessary to meet the statutory goals of sentencing. Accordingly, given (1) Mr. Ward's relatively short-lived presence inside the Capitol,

during which he did not assault anyone or commit any other act of violence against either person or property, (2) his lack of criminal history, (3) his personal history and circumstances, and (4) his acceptance of responsibility; a probationary sentence and accompanying restitution order is sufficient but not greater than necessary to meet the goals of sentencing and is in line with others who have been sentenced for similar conduct.

## I.       Mr. Ward's Actions on January 6th

Before January 6, Mr. Ward had never attended a political rally or event.  Hearing about the event in the days and weeks leading up to the 6th, Mr. Ward believed that it would prove to be a historic day in our nation's history; as such, he and three friends made plans to attend the now-former president's rally.  However, Mr. Ward was totally unaware that the events of January 6 would not only prove to be historic but infamous and shameful.

On January 5, 2021, Mr. Ward and his friends arrived in the DMV area to attend the next day's political events in Washington, D.C.  The advertised subject matter being addressed at the January 6 event was revealing supposed "new information" concerning the recent presidential election and alleged irregularities in the voting process.  After arriving in the area on January 6, Mr. Ward and his friends departed their hotel room mid-morning and reached the Washington Monument.

Once at the Washington Monument, Mr. Ward and his friends listened to several speeches over the loudspeaker system, and at some point, Mr. Ward became separated from his small group and made his way toward the Capitol building.  En route, Mr. Ward was able to meet up with his friends again, wherein they all proceeded with the growing crowd to the Capitol.  Once near the Capitol building, Mr. Ward observed a large gathering of people near the building, smelled the odor of tear gas, and heard loud bangs.  Instead of turning around, Mr.

Ward made his way through the crowd and toward the building to get a better look at what was taking place.  In retrospect, Mr. Ward recognizes that this was the wrong decision:

> "It is clear that I committed a crime in Washington, DC, on January 6th at our Capitol Building. I broke the law the moment I crossed the threshold into our Capitol. I now know this to be an indisputable fact.  I admit my wrongdoing and earnestly apologize to Your Honor, the Federal Court, the United States government, the staff and lawmakers present that day, the police officers deployed to the Capitol that day, and citizens of our country at large.  I am deeply sorry for committing this crime and wish I had gone to work that day instead…My behavior on January 6th has tainted my family, and for that I feel deep remorse and shame.  I am an adult, and I knew better; I made a horrible and completely unnecessary decision to cross a line that cannot be undone.  Since that day, I have carried a heavy load of fear, anxiety, shame, and regret.  It is a deserved pain that I earned by my choice to enter our Capitol."

**Exhibit 1, pg. 1 (Ward's Letter to the Court)**.

Unfortunately, however, Mr. Ward chose to enter the Capitol building.  Mr. Ward spent roughly forty-seven minutes inside the Capitol building, leaving through the South Door at 3:02 p.m.  Indeed, the sum total of Mr. Ward's actions while inside the Capital building can be summed as follows: entering through the Senate wing doors at 2:14 p.m., going to the Supreme Court Chamber stairs, passing by the law library, entering the Crypt lobby, traveling by the memorial doors and walking through the hall of columns.  *See* Dkt. 7, pp. 3-4 (Ward Statement of Offense).  During this time, Mr. Ward was mulling around the hallways and corridors, taking pictures and videos, observing other marchers, and engaging in conversation with a police officer.  At some point, Mr. Ward foolishly took a picture of himself on a sofa couch.

To be clear, Mr. Ward's limited involvement in the January 6 riots was serious and beyond juvenile; indeed, as Mr. Ward has already stated, it was criminal.  However, at no point did Mr. Ward commit, or even contemplate committing, any acts of physical violence, nor did he deface property or otherwise cause harm to others.

Furthermore, since his arrest for the instant offense, Mr. Ward has never tried to defend his behavior that day, attempt to deflect blame by calling himself a "citizen journalist" (somehow entitling him to be present that day) or take any other steps to minimize or justify his behavior. Foolishly, however, after leaving the Capitol building that day, and after the magnitude of what had transpired started to dawn on him, Mr. Ward deleted the original photos and videos that he took in the Capitol that day. Before deleting these photos and videos, however, Mr. Ward backed up this media to a separate storage device and provided copies of the same to the government when requested.

What's more, in addition to Mr. Ward never attempting to deflect blame for his behavior and affirmatively taking responsibility for his conduct, Mr. Ward has also expressed his deep and wholehearted remorse for his participation in that day's events:

> "[On January 6th] I acted in a juvenile manner, going so far as to take a picture of myself on a couch. My conviction pertaining to January 6 will forever be a black mark on my character. The only thing that I can say is that my lapse in judgment that day is not reflective of my overall character....Your Honor, my actions while inside the Capitol on January 6 were wrong and non-excusable, and I accept full responsibility for my criminal conduct that day. I arrogantly deputized myself with authority in a dangerous setting. I am fortunate I did not bring injury upon myself or others and I'm grateful I was afforded the opportunity of pleading guilty to a misdemeanor. The only thing left for me to do now is rebuild the trust that I have lost and get back to work. I thank Your Honor for your patience in reading this letter, and I promise that this lapse in judgement will never happen again. I would also like to apologize to the United States government in that it had to expend time and resources on me, given my behavior that day."

Ex. 1, pp. 2-3.

When contacted by the government regarding his involvement in the January 6 riots, Mr. Ward immediately hired the services of an attorney and soon thereafter entered into a plea agreement with the government—subsequently pleading before this Honorable Court. Indeed, his immediate acceptance of responsibility in this case saved government resources: "Ward agreed to a precharge resolution of this matter which avoided the need to arrest him, initiate

4

removal, and commence initial proceedings in the federal courts. His court proceeding was a self-surrender and initial appearance and change of plea in this matter." Dkt. 16, pg. 9 (Govt Sentencing Memo). Mr. Ward never tried to dispute his involvement with the Capitol that day and has cooperated with the government when requested—going so far as to hand over photographs and videos he took while inside the building that day, voluntarily and without threat of subpoena. Mr. Ward was permitted to self-surrender to law enforcement immediately preceding the entry of the instant plea and was placed on pre-trial trial supervision on August 28, 2023—and has remained on supervision ever since.

To be sure, Mr. Ward's conduct while at the Capitol was serious and worthy of punishment. However, for the reasons stated below, a probationary sentence and order of restitution is commensurate with the conduct that Mr. Ward actually exhibited while at the Capitol on January 6.

## II. A Sufficient Sentence Under 18 U.S.C. § 3553(a)

Since *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has required district courts to consider *both* the United States Sentencing Guideline ("U.S.S.G") range and the sentencing factors set out in 18 U.S.C. § 3553(a) when determining a criminal defendant's ultimate sentence. As such, sentencing courts are instructed to first consider the statutorily authorized sentence, correctly calculate the Guideline range for a given defendant, then consider the § 3553(a) factors to determine whether a sentence within the Guideline range is appropriate or whether a departure or variance from the Guidelines is warranted. *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Indeed, by enacting 18 U.S.C. § 3553 Congress has *directed* that federal courts "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing based on the statutory factors laid out in the statute.[1]   Additionally, the Supreme Court has held that sentencing courts are required to "consider what sentence is appropriate for *the individual defendant* in light of the [§ 3553(a)] sentencing factors," *Nelson*, 555 U.S. at 351 (emphasis added), to ensure that the punishment imposed in a particular case "fit[s] the offender and not merely the crime[.]" *Williams v. New York*, 337 U.S. 241, 247 (1949); *see also Spears v. United States*, 555 U.S. 261 (2009) (explaining that the Sentencing Guidelines cannot be used as a substitute for a court's independent determination of a just sentence based upon consideration of the statutory sentencing factors).   As demonstrated further below, a "just" sentence for Mr. Ward, taking into account the § 3553(a) factors, would be a probationary sentence, community service, or both.

First, looking at the statutorily authorized sentence in Mr. Ward's case, the maximum sentence for a violation of 40 U.S.C. § 5104(e)(2)(G) is a term of imprisonment of not more than six months, 40 U.S.C. § 5109(b).   Moreover, Mr. Ward's offense of conviction is deemed a petty offense and classified as a Class B misdemeanor, 18 U.S.C. §§ 3559(a)(7), and 19.   As such, the United States Sentencing Guidelines do not apply to Mr. Ward's case.   *See* U.S.S.G §1B1.9 ("The sentencing guidelines do not apply to any count of conviction that is a Class B or C

---

[1] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

misdemeanor or an infraction."); PSR, pg. 15, ¶62.  Given that Mr. Ward has pleaded guilty to a petty offense, the only question left to be decided by this Court in its determination of a proper sentence is whether probation _or_ a term of active incarceration is appropriate.

Unlike for most other criminal offenses, Congress has seen fit to explicitly bar a term Supervised Release for petty offenses.  *See* 18 U.S.C. §3583(b)(3) ("[e]xcept as otherwise provided, the authorized terms of supervised release are [] for a Class E felony, or for a misdemeanor (*other than a petty offense*), not more than one year.") (emphasis added).  What's more, as recognized recently by the D.C. Circuit Court in *United States v. Little*, Congress has also expressly barred "split sentences" (a combination of incarceration and probation) for petty offenses.

In *United States v. Little*, 78 F.4th 453 (D.C. Cir. 2023), the defendant, like Ward, had been convicted of the petty offense of Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).  Following his guilty plea, the district court sentenced the defendant to "sixty days in prison followed by three years of probation." *Id*. at 454.  The issue on appeal was whether 18 U.S.C. § 3561, which established probation as a separate form of punishment, permits split sentences on a single petty offense conviction.  In relevant part § 3561 states: "[a] defendant who has been found guilty of an offense may be sentenced to a term of probation unless []the defendant is *sentenced at the same time to a term of imprisonment* for the *same* or a *different offense that is not a petty offense*." 18 U.S.C. § 3561(a)(3).

In overturning the defendant's sentence, the D.C. Circuit held: "[t]he only question on appeal is whether that [split] sentence is authorized by statute.  It is not.  Probation and imprisonment are alternative sentences that cannot generally be combined.  So the district court

could not impose both for [defendant]'s petty offense." *Little*, 78 F.4th at 454.  In explaining the

rationale underlying its holding, the D.C. Circuit reasoned that:

> "there are two possible readings of § 3561(a)(3). Our reading keeps probation and imprisonment as separate sentences. 18 U.S.C. § 3551(b). It takes seriously Congress's instruction not to impose post-confinement monitoring on petty offenders. *Id.* § 3583(b)(3). And it gives § 3561 a serious role to play in the statutory scheme — allowing imprisonment for one petty offense and probation for a *different* offense, while confirming that prison plus probation is not an available sentence for the same offense."

*Id. at* 460.  As such, like in *Little*, Mr. Ward can only be sentenced to *either* a term of

imprisonment or probation—but not both.

Second, though the guidelines are not directly applicable to Mr. Ward's offense, they do

lend some support to his probationary sentencing request.  Recently, the United States

Sentencing Commission and Congress have made substantial amendments to portions of the

Sentencing Guidelines.  The Commission added a new Guideline section 4C1.1, under Chapter

4—Criminal History.  Specifically, new section 4C1.1 provides for the *decrease* of two offense

levels if the defendant meets all of the following criteria:

> "(1) the defendant did not receive any criminal history points []; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving [Civil] Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise[.]"

U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines—Preliminary, pg. 72 (April 5, 2023).[2] *see also* U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines, Retroactive Application, pp. 1-2 (Aug. 31, 2023) (explaining that the effective date of §4C1.1 was Nov. 1, 2023, because "the policy reasons underlying []the amendments apply with equal force to individuals who are already sentenced;" while also stating that the amendments to the Guidelines recognize that "*individuals with zero criminal history points have considerably lower recidivism rates than other sentences individuals*") (emphasis added).[3]

Here, it is submitted that had the guidelines applied to Mr. Ward's case, he would have been entitled to the new §4C1.1 decrease of two offense levels for being a Zero-Point Offender. As previously mentioned, Mr. Ward has no criminal record with the relevant Guidelines period, and plainly, Mr. Ward's offense conduct did not implicate any of the exceptions found in §4C1.1—this is not a terrorism offense; Mr. Ward did not use violence or credible threats of violence in connection with the offense nor did it result in death or serious bodily injury; the instant offense of conviction is not a sex offense; Mr. Ward did not personally cause substantial financial hardship; no firearm was used during Mr. Ward's offense; the instant offense of conviction is not covered by §2H1.1 (Offenses involving Civil Rights); Mr. Ward would not have received an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and finally, Mr. Ward would not have received an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise.

---

[2] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

[3] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_RF-retro.pdf.

More importantly and to the point, in addition to the changes in Chapter 4, the Commission also added new Application Note 10(B) to §5C1.1 (Imposition of a Term of Imprisonment) addressing "nonviolent first offenders" such as Mr. Ward.  *See* U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, Amendments to the Sentencing Guidelines, pg. 82 (April 27, 2023).[4]  Specifically, the new application note provides:

> "that a departure, including a departure *to a sentence other than a sentence of imprisonment*, may be appropriate if the offender received an adjustment under new §4C1.1 and the applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."

*Id.*  (emphasis added).

Given that Mr. Ward would most likely have received an adjustment under new §4C1.1 if the Guidelines had applied to his case, combined with the specific factual underpinnings of his offense of conviction, any term of active incarceration would "overstate[] the gravity of [Mr. Ward's] offense." U.S.S.G. §5C1.1, App. N. 10(B).  As previously stated, Mr. Ward did not assault a single person during his stay at the Capital, nor did he deface any public or private property.  However, to atone for adding his voice and support to those rioters that day, Mr. Ward took the very significant step of pleading guilty to a criminal offense—one that is connected to one of the most infamous events in recent memory—and voluntarily provided evidence of his own criminal conduct to the government.

Mr. Ward, now convicted January 6 participant, will have to deal with the consequences of such a conviction for the remainder of his life.  Indeed, for all of these reasons, and those enumerated below, a probationary sentence and restitution is warranted in this case.

---

[4] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.

### a. Sean Ward's Personal Background and History

As stated in the Pre-Sentence Report, Mr. Ward was born in Queens, New York, in 1967 to married parents as the oldest of four children.[5]  Both Mr. Ward's parents were immigrants, his father from Ireland and his mother from Scotland, and both were hard-working individuals—his father being employed as a restaurateur and his mother as a childcare provider and home keeper for several families.

During his formative years, Mr. Ward grew up in a loving "blue-collar" household. Though the Wards were by no means a wealthy family—his parents were unable to buy the children new clothes and instead relied on hand-me-downs—the family's income did provide for a stable home life, with the children never wanting for the basic necessities in life.  Indeed, the neighborhood of Mr. Ward's youth was filled with hard-working American families, was safe, and children played outside while their parents worked.  Moreover, Mr. Ward's family were "typical" Catholics—attending weekly Mass and performing the sacraments.  As such, Mr. Ward enjoyed the additional benefit of an extended church community growing up.

Having the nobility of "hard work" engrained in him early on, Mr. Ward went to work at the age of ten, shoveling his neighbor's driveways and salting roads by hand in the winter and lawn care in the summer.  When he was sixteen, Mr. Ward got a job in the prep kitchen and as a janitor at one of the restaurants where his father was employed—however, before sixteen, Mr. Ward also worked "under the table" as a bus boy at several restaurants to help supplement the family income.  The work at his father's restaurant was tough; his shifts in the prep kitchen often lasted eight hours and were immediately followed by his cleaning shifts as a janitor—where he

---

[5] Mr. Ward's had three young sisters, ages 55, 53, and 51.

would stay until closing, in all working twelve hours most days.  Though tough, Mr. Ward has fond memories of he and his father working together.

During grade school, Mr. Ward suffered from what we know now is ADD; however, at the time, Mr. Ward was labeled by his teachers as lazy, hyper, and mischievous.[6]  Given that Mr. Ward was not given the attention and support he needed as a student, he did not perform well in school.  Nevertheless, after graduating from High School in 1985, Mr. Ward enrolled in Rockland Community College and majored in business administration.  During the summer after his first year in College, Mr. Ward started work with a company painting homes and other structures.  Making, for the first time in his life, decent money, Mr. Ward left college and worked full-time for the painting company.

Seeing that he had discovered a meaningful way to support himself and his family, and after working for others for three years, Mr. Ward formed his own painting company and started work for himself in 1988—something that he is still doing to this day.  At the height of its success, Mr. Ward's painting business employed 15 employees, sponsored immigrants in their visa applications, and provided a stable source of income for both Mr. Ward's and his employees' families.

In 1992, Mr. Ward married his long-time girlfriend and had two children together—a son who is currently twenty-eight and a daughter who is currently twenty-seven.  Unfortunately, however, this marriage was not to last, and in 1997, Mr. Ward and his wife obtained a divorce.  Despite the dissolution of his marriage, Mr. Ward remained very close to both of his children and made sure that the difficulties he was experiencing with their mother did not affect their upbringing.  To his credit, Mr. Ward's children still reside near him in New York and maintain a

---

[6] Mr. Ward was diagnosed with ADD as an adult.

very healthy and positive relationship to this day.  It was also during this time, in 1999, that Mr.

Ward enrolled at New York University and obtained a certification in Construction Management.

Growing up as the son of immigrant parents, patriotism and love of their family's

adopted country were instilled into Mr. Ward at a very early age:

> "I am a First Generation American; my parents and granduncle left their homelands and large families for a new life in America.  Each came here alone and never looked back. They cherished our country and the opportunities it afforded them.  Knowing how each chose to leave all behind made it crystal clear to me as a young boy that America is an extraordinary place.  They became citizens, figured out how baseball worked, and praised America constantly.  Being American gave them such pride.  I have not met anyone more grateful and patriotic.  My parents have the American flag etched onto their tombstone[.]"

Ex. 1, pg. 3 (Ward Letter to Court).

Given his deeply ingrained patriotism, imparted to him by his parents, and being a

lifelong New Yorker, the attacks of September 11 on the World Trade Centers were practically

impactful on Mr. Ward.  In fact, immediately after the attacks on that horrible day, Mr. Ward felt

the call to assist in whatever way he could: "[w]hen we were attacked on 9/11, and all bridges

into the city were shut down, a friend and I paddled across the Hudson River by canoe.  We were

onsite by that afternoon.  We assisted the emergency responders in whatever way was helpful.

The following afternoon, we paddled back across the river to get home." Ex. 1, pg. 3 (Ward

Letter to Court).  Below are some pictures that Mr. Ward and his friend took when they got to

the former site of the Towers on September 11—Mr. Ward is pictured in the bottom left:

 





It is without question that Mr. Ward acted selflessly in his actions in the hours immediately following the 9/11 attacks. And, as with many Americans, the events of September 11 had a lasting impact on Mr. Ward, and the scenes he witnessed while attempting to assist first responders that day are still etched into his memory.

Happily, in 2008, Mr. Ward had a second chance at marriage and was lucky enough to marry his current wife, who described Mr. Ward to the PSR writer as:

> "[He is] a sweet, funny, and intelligent person. She added that he was loved and respected by many. He is a wonderful father. She described their relationship as loving and supportive. Mr. Ward's involvement in the offense has left her frustrated. [] [S]he knows Mr. Ward's curiosity led him to be in the wrong place at the wrong time. While she is not negating his actions, she would like the Court to know, her husband had no malicious intent. She was surprised of his involvement because it is out of his character."

PSR, pg. 11, ¶34.

As previously alluded to, family and community have always played a massive role in Mr. Ward's life. So much so that both Mr. Ward's children and siblings still reside in New York relatively near one another. Sadly, though, both Mr. Ward's parents have passed away—the latest being his father earlier this year and his mother 10 years ago from cancer-related issues. When Mr. Ward's father was in the end stages of his life, passing in February of this year, all of Mr. Ward's family chipped in and took time out of their busy home and professional lives to take care of the patriarch of the family.

Regarding his professional life, recently, Mr. Ward has suffered several economic setbacks that have forced him to lay off a great number of his employees. This downturn in his business was due in large part to the COVID-19 pandemic and a failed business venture—leading to his company owing roughly $102,763.00 to a debt consolidation company. However, despite these recent hardships, Mr. Ward is working hard to get his business back on track and profitable again—where he can hire back some of his lost employees to take on larger and more expansive jobs.

As alluded to above and demonstrated in the following section, Mr. Ward has the strong family, community, and professional support in place to live a positive and meaningful life. Indeed, Mr. Ward is a stable and contributing member of his local community and family. It is for this, and the below-stated reasons, that this Court should impose a probationary sentence; such a sentence would provide a just punishment for Mr. Ward's action while at the same time not destroying the substantial gains that Mr. Ward has made in his personal and professional life.

### b. *Community Support and Personal Characteristics*

As is made readily apparent from the letters of support submitted to this Court, Mr. Ward is known as a deeply hardworking and caring individual. *See* **Exhibit 2 (Letter of Support).**

Indeed, what stands out the most in reviewing the numerous letters submitted here is how

individuals who know Mr. Ward best describe him:

- One of Mr. Ward's sisters states, "Our parents instilled in us gratitude, respect, appreciation, kindness and hard work. And that is how I would describe my brother. He is grateful for the little things in life, as well as the big, he respects and appreciates others, is known to be the one to call when you need a helping hand, he is kind and as an entrepreneur he is hard working and well respected in our community…I am forever grateful to him for helping me be the first one in our family to go to college – first generation college. Our parents did not have the money to send all 4 of us to college. Sean started his own business and supported me with my dream to going to college." Ex. 2, pg. 001;

- A friend of many decades described Mr. Ward as follows, "Sean is fiercely devoted to his family and friends. He has always been willing to go above and beyond for others, without anything in return. Sean consistently demonstrates his heartwarming generosity. His selflessness is truly inspiring…Loyalty is a quality that sets Sean apart from others. He is devoted to his commitments be it to family, work, community or friends. Sean consistently demonstrates loyalty by standing by his friends and family through thick and thin." Ex. 2, pg. 012;

- Finally, another long-time friend (over four decades) stated that "I watched Mr. Ward turn into a young adult, getting engaged, married and starting a family. Life wasn't without its hurdles and I witnessed firsthand how Mr. Ward took responsibility for situations within his life and made some very positive changes that allowed him to continue to grow in his personal life, professional life and within his community." Ex. 2, pg. 005.

Perhaps even more inspiring and worthy of note is how Mr. Ward has treated his

employees over the years and how much he has given back to the community. Indeed, in almost

every single letter submitted to the Court are comments and praise for Mr. Ward's dedication to

his employees and the time and attention he spends on the needs of others:

- A former customer and current friend of Mr. Ward wrote, "Sean is a kind, warm and thoughtful person. He treats both his customers and his workers with dignity and respect. Most of the people who worked for him remained part of the crew over those twenty plus years. I can't say the same for other contractors who have worked in my home. I observed more of Sean's kindness and respect when my elderly parents would be staying with me. Sean would go out of his way to engage them in conversation which they loved. To some, the elderly are invisible, but not Sean!" Ex. 2, pg. 015;

- Another member of Mr. Ward's local community and friend for the past 20 years stated, "Sean has also shown himself to be an active and caring member of our community. I offer one recent example in which he donated his time and skills in a local project to retrofit and

customize a home for a catastrophically injured high school student.  Sean was a key part of the team of volunteers who built an extension and adapted the home of local grandparents so that they could take in and provide a supportive loving home for their permanently disabled grandson.  No fanfare, just doing what he felt was right." Ex. 2, pg. 017;

- A former customer and friend of Mr. Ward goes onto to express his awe of Mr. Ward by stating, "In my long lifetime, I have not met an individual that I trust more than Sean. I was first introduced to Sean in The 1990s[]…He hired and personally mentored his employees and always looked out for me and my family…I was honored when Sean asked me to assist in sponsoring one of his employees [] for citizenship. Since I was not born in the United States and had only become a citizen ten years prior, it carried tremendous significance for me that Sean cared about sharing the American dream with his employees." Ex. 2, pg. 003.

- Finally, Mr. Ward's second sister, who also works part-time for his company, recounts that "[Sean] never questioned when I needed time for my family.  He does the same for his painters.  Family comes first.  He also makes sure that his painters are paid first.  Owning a small business is hard, with many costs involved.  Many times, Sean would not take a paycheck so that his employees were taken care of." Ex. 2, pg. 010.

Put plainly, Mr. Ward is a longtime valued member of his community, and the behavior that he exhibited in deciding to enter the Capitol on January 6 was a one-time, out of character, occurrence that will not repeat itself.  *See* Ex. 2, pg. 006 ("It's unfortunate that momentary mistakes in judgment were made, bringing us here today.  I truly believe that no one will benefit from Mr. Ward being punished to the point where he wouldn't be able to financially and emotionally provide for those that have come to see him as a pillar of strength in their lives"); *id*. at 017 ("[d]espite the current case, I still believe Sean Ward to be an honorable individual, a valuable member of our community, and a good person[]"); *id*. at 018 ("I understand that Sean has been convicted of the crime and understand you have a job to do and apply the law.  Please take into consideration that I believe [that Sean] is a good man who made a bad decision on that day."); *id*. at 21 ("In business and life, except for this one blip on the radar, [Sean's] integrity and honesty are unchallenged. I respectfully request leniency in his sentencing.")

### c. *Seriousness of the Offense, Respect for the Law, Just Punishment, Deterrence and Protection of the Public*

A probationary sentence, in Mr. Ward's case, would conform with the mandates of 18 U.S.C. § 3553(a) by respecting the seriousness of his offense, promote respect for the law, and provide both specific and general deterrence.

Mr. Ward stands before this Court as a January 6 convicted defendant, a mark that he will carry with him for the rest of his life. Despite any argument by the government to the contrary, and as plainly evidenced above, Mr. Ward has accepted responsibility for his role in the January 6th riot by pleading guilty to a criminal offense and cooperating with the government when it has requested. Though Mr. Ward was required to meet and debrief with the government regarding his action at the Capitol as part of the terms of his plea agreement, he voluntarily provided the pictures and videos he took that day, something he was not required to do. Mr. Ward was not self-serving in his cooperation with the government—seeking only to point the finger at other individuals and refusing to discuss his own conduct—in fact, he provided information about his own behavior that could only increase his sentencing exposure:

> "He *admitted* that he witnessed violence and chaos at the barricades, and felt the residual effects of the pepper spray on rioters, but continued into the U.S. Capitol, nonetheless. *He further admitted* that once inside, he saw destruction and vandalism…*During the interview, Ward consented to the government's request* to provide the government with the photos that were on his phone, and he subsequently produced these photos to the government. These photos include the photo of Ward lounging on a couch in Senate Conference Room S145, a sensitive space."

Dkt. 16, pg. 7 (Govt Sentencing Memo) (emphasis added).

Importantly, Mr. Ward's acceptance of responsibility is also recognized by the Probation Office in its recommendation of a probationary sentence for Mr. Ward:

> "Sean Ward's culpability appears to be minimal in contrast with rioters who destroyed or stole government property or were outfitted in any military or protective gear…To his credit, the defendant has accepted responsibility which was captured in his allocution letter

to the Court, dated November 8, 2023.  The defendant has marketable skills and a stable employment history…The defendant is a good candidate for voluntary surrender as he remains compliant with his release conditions, has appeared for all scheduled Court appearances, and is not an apparent flight risk or a danger to the community. 18 USC § 3143(a)(2)."

Dkt. 14, pp. 1-2 (Sentencing Recommendation).

Likewise, Mr. Ward's acceptance of responsibility is acknowledged by those who have written letters of support to this Court and by Mr. Ward himself in his allocution letter, "[y]our Honor, my actions while inside the Capitol on January 6 were wrong and nonexcusable, and I accept full responsibility for my criminal conduct that day. I arrogantly deputized myself with authority in a dangerous setting.  I am fortunate I did not bring injury upon myself or others and I'm grateful I was afforded the opportunity of pleading guilty to a misdemeanor."  Ex. 1, pg. 3.

Indeed, considering the sum total of Mr. Ward's actions in connection with the January 6 supports his position that no period of incarceration is warranted.  As previously stated, on January 6, 2021, Mr. Ward briefly attended the former president's "Stop the Steal" rally, after which he proceeded, along with hundreds of others, to the United States Capitol building.  After arriving inside the Capital building, Mr. Ward spent time roaming the hallways and corridors, taking pictures and videos—again, which he turned over voluntarily to the government. Importantly, Mr. Ward never made physical contact (violent or otherwise) with any individual or police officer, nor did he deface or destroy property.

The aforementioned conduct was ill-advised, reckless, and just plain foolish.  However, Mr. Ward's conduct, through criminal, was, again, non-violent and resulted in no physical injuries or property damage.  In the past, the government has made the blanket statement that "the violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process." *See* FBI Director Wray Statement before the House Oversight and Reform Committee, EXAMINING THE JANUARY 6 ATTACK ON THE U.S. CAPITOL (June 15, 2021).[7] However, it has nevertheless "been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an *individual and every case as a unique study in the human failings*...." *Gall v. United States*, 552 U.S. 38, 52 (2007) (emphasis added). The individual story of Mr. Ward's conduct as it relates to the January 6th event is clearly different from others whom this Court has punished.   Indeed, as discussed further below, the harm caused by Mr. Ward's conduct is less severe than others who have received sentences other than incarceration for the same or similar conduct.

Moreover, "[p]robation is not an act of leniency.  Probation is a substantial restriction of freedom; it is not forgiveness, and it is not an endorsement of the offense." *United States v. Myers*, 353 F. Supp. 2d 1026, 1032 (S.D. Iowa 2005) (citation omitted).  The fact that Mr. Ward is seeking a probationary sentence does not mean that he is seeking to be absolved of punishment as it is "[i]nherent in the very nature of probation [] that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (citations and internal quotations omitted); *See also Gall v. United States*, 552 U.S. 38, 48 n.4 (2007); ("Probation is not granted out of a spirit of leniency. . . . As the Wickersham Commission said, probation is not merely 'letting an offender off easily'") (citing Advisory Council of Judges of National Council on Crime and Delinquency, *Guides for Sentencing* 13-14 (1957).

---

[7] Available at: https://www.fbi.gov/news/testimony/examining-the-january-6-attack-on-the-us-capitol-wray-061521.

As previously mentioned, Mr. Ward has been on pre-trial probation since the entry of his plea in August, and since that time, Mr. Ward routinely checked in with his pre-trial officer, underwent an unannounced home check, and has passed the last several months on supervision without a single incident.  Given that Mr. Ward has established a good track record while on pre-trial release and possesses a demonstrated history of lawful behavior; combined with the fact that Mr. Ward has in place a strong family and community support network and is a pillar of his local community, all of which will ensure that he does not run afoul of the law again.

Indeed, given the above, this Court should be put at ease and have no reason to doubt that Mr. Ward will faithfully comply with the law in the future and no reason to fear that he will suffer a similar lapse in judgment again.

Finally, despite the division that exists across the country, sending Mr. Ward to prison for any period of time is not an effective way to achieve the goal of general deterrence in this particular case.  According to the National Institute of Justice, "the certainty of being caught is a vastly more powerful deterrent than the punishment."  U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things about Deterrence*, May 2016.[8] Research has found evidence that prison can exacerbate, not reduce, recidivism:

> "… compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement.  We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects."

*Id*. at 2.

Certainly, the threat of *any prison* sentence for a criminal offender such as Mr. Ward is a significant punishment.  The public shame of being involved in such a sorted affair and the loss

---

[8] Available at: https://www.ojp.gov/pdffiles1/nij/247350.pdf.

of business given his connection to the January 6 event is sufficient but not greater than necessary to both deter Mr. Ward from further criminal conduct and work as a general deterrent to the public at large.  *See* 18 U.S.C. § 3553(a)(2)(B) and (C); *United States v. Russell,* 600 F.3d 631, 637 (D.C. Cir. 2010) ("Subsections 3553(a)(2)(B) and (C) codify the penal goals of general and specific deterrence, requiring disincentives to match the severity of punishment to the harmfulness of the crime.")

### d.   The Need to Avoid Unnecessary Sentencing Disparities

As part of the Court's calculus in arriving at an appropriate sentence, the need to avoid unwarranted sentence disparities among similarly situated defendants is an important and statutorily mandated factor that any sentencing court must consider in arriving at its ultimate sentencing decision.  *See* 18 U.S.C. § 3553(a)(6).  Considering the sentences received by other January 6 defendants, a probationary sentence is sufficient but not greater than necessary to achieve the goals of sentencing in Mr. Ward's case.  In examining the conduct of other January 6 defendants who received sentences other than active incarceration—and who arguably engaged in far more offensive and serious conduct than Mr. Ward—adds support for Ward's sentencing request.  **See Exhibit 3 (January 6 Sentencing Table)**.[9]

Importantly, despite the government's conclusory statement that "for a misdemeanor defendant like Ward, the absence of violent or destructive acts is not a mitigating factor. Had Ward engaged in such conduct, he would have faced additional criminal charges[,]" Dkt. 16, pg. 9; as plainly shown below, the fact that Mr. Ward was not violent, did not have any physical

---

[9] In the interests of brevity, Counsel has only selected four cases from Exhibit 3.  However, even a cursory review of all fourteen cases detailed in the Table clearly shows that the conduct exhibited by those defendants was arguably more much more severe (or at least the same) as the conduct underlying Mr. Ward's conviction—and all the defendant's listed in Exhibit 3 received a sentence other than active incarceration.

contact with police, and did not destroy property is a *strong* mitigating factor—and one that supports his request for a probationary sentence.

Indeed, the differences between Mr. Ward's conduct and that exhibited by other January 6 defendants—especially those who were charged with standalone 5104(e)(2)(G) Parading offenses—cannot be emphasized enough.  Again, Ward did not engage violently with the police, use weapons, hurl objects through windows, use drugs, or deface property.  To be clear, Mr. Ward's conduct on January 6 was unlawful, indefensible, and unjustified.  However, the conduct he exhibited was markedly different from defendants *Blauser*, *Gonzalez*, *Carico,* and *Rodean*—whose cases are briefly summarized below.

In *United States v. Blauser*, 1:21-CR-00386, the Court—on the same misdemeanor Parading offense that Ward has pleaded to—sentenced the defendant to *neither* incarceration or probation (despite the government's request for 3 months of home detention).  There, the defendant engaged in the following conduct:

> "(1) Blauser pushed his way through the East Rotunda door and (2) he is captured on CCTV having some physical contact with law-enforcement as they were trying to get people to exit the Capitol Building.  He lowered his shoulder [] and pushed into law-enforcement to apparently get access to co-defendant Bauer and extricate her...At one point in the Rotunda, Pauline Bauer can be seen and heard confronting law-enforcement and screaming "bring them out . . . they need to hang." ...When law-enforcement tries to get Bauer to back up, she says "Fuck you, you back up" and pushes law-enforcement."

*See* Dkt. 98, pp. 1-4 (Govt Sentencing Memo).  Here, Mr. Ward did not have *any* physical contact with any police officers.  More importantly, unlike Blauser's co-defendant, Mr. Ward did not portend to kill anyone by threatening to "hang" them.

In *United States v. Gonzalez*, 1:21-CR-115, the Court sentenced the defendant—again, on the same 5104(e)(2)(G) Parading offense—to 24 months of probation (despite the government's request for 3 months of incarceration).  There, the defendant engaged in the following conduct:

> "Gonzalez (1) was among the first wave of rioters to enter the U.S. Capitol despite seeing violence between rioters and officers; (2) made numerous recordings from the riot and the Capitol; (3) illegally smoked and distributed marijuana to others in the Capitol; (4) only left the Capitol when forced to do so by law enforcement; (5) livestreamed a review of his footage from the January 6 attack on the Capitol in the days following the riot, including noting that he and others were looking for doors to break in; (6) hid from law enforcement after the January 6 attack; and (7) publicly and repeatedly communicated a lack of remorse in his own livestreams, on multiple public platforms, and in an interview aired as part of an HBO documentary—including blaming "infiltration" by "Antifa" and the "FBI.""; "Gonzalez exited the Rotunda into the East Rotunda Door interior, close to an exit to the Capitol. Rather than exit the building as so many law enforcement officers ordered, Gonzalez attempted to turn back and return to the Rotunda."

*See* Dkt. 41, pp. 4-5 (Govt Sentencing Memo).  Here, unlike Gonzalez, Mr. Ward did not attempt to blame the FBI or "Antifa" for his conduct but instead has repeatedly expressed remorse for his actions that day—along with providing the government his own videos and photos.  Moreover, once Mr. Ward left the Capitol building that day, unlike Gonzalez, he never attempted to re-enter.

In *United States v. Carico*, 1:21-CR-696, the Court sentenced the defendant to 60 days home detention (despite the government's request for 30 days of incarceration)—again, on the same 5104(e)(2)(G) Parading offense as Ward.  There, the defendant engaged in the following conduct:

> "Carico: (1) entered the Capitol through the Senate Wing Doors about nine minutes after they were breached; (2) spent about 52 minutes in the Capitol and called for a "second wave" of rioters; (3) left the Capitol only after police officers started clearing the Rotunda; (4) walked around the Capitol building, climbed the media tower near the Inauguration platform, and filmed violence against police officers taking place on the Lower West Terrace; (5) referred to the police officers being attacked as "fucking traitors" and yelled that the Speaker of the House of Representatives should "go fuck [her]self"; (6) subsequently deleted many of the photos and videos he took on January 6; (7) repeatedly denied having done anything wrong, claimed that the day "was peaceful" despite witnessing violence, and said "I'm a Patriot and screw anyone that thinks different"; and (8) expressed remorse only in anticipation of this sentencing, but still made inaccurate statements to the Probation Officer about his marijuana use."

24

*See* Dkt. 33. pp. 1-2 (Govt Sentencing Memo).  Mr. Ward never used illegal drugs during his

stay at the Capitol, nor did he attempt to call for a "second wave" of rioters, like defendant

Carico.  Moreover, Mr. Ward never climbed the media tower near the Inauguration platform, nor

did he attempt to deny that his behavior was wrong or illegal—such as Carico.

Finally, and perhaps most illuminating, is the case of *United States v. Rodean*, 1:21-CR-

057, where the Court sentenced the defendant to 5 years probation (despite the government's

request for 57 months of incarceration) following a bench trial where the defendant was

convicted of seven offenses, which included both felonies and misdemeanor offenses.  There, the

defendant engaged in the following conduct:

> "Rodean smashed two windowpanes of the U.S. Capitol building with a flagpole and a
> metal object during the January 6, 2021 attack.  To get to the building, he, together with
> other rioters, pushed through or past snow fencing, makeshift bike rack barriers,
> scaffolding, and even a police line on the west side of the building.  Once inside, he and
> other rioters (some of whom were yelling "where are they counting the votes?") pursued
> U.S. Capitol Police Officer Eugene Goodman up the stairs to the hallway outside of the
> Senate chamber.  Outside of the Senate chamber, Rodean engaged in a stand-off with a line
> of police officers who warned rioters to stay back and to leave.  Instead of leaving, Rodean
> remained in the hallway for over forty minutes, at one point, displaying a hatchet to an
> officer, and at another point, posing for a photo while waving his "Trump is my President"
> flag.  The next day, he told a supervisor at his job that he "did what needed to be done.""

*See* Dkt. 67, pp. 1-2 (Govt Sentencing Memo).  The distinctions between Mr. Ward and Roden

are vast.  Mr. Ward did not deface or destroy any property while at the Capitol, nor did he

personally push through a police line, chase police officers, or engage in a stand-off with

officers.  Most importantly, however, and unlike Rodean, Mr. Ward did not use a hatchet (or any

weapon) during his underlying offense.

Though Mr. Ward did not spend an insignificant amount of time inside the Capitol, he is

hardly alone.  Indeed, as sampled below, many of the January 6 defendants who received

sentences other than incarceration spent roughly the same or more time within the Capitol

building:

- *United States v. Stotts*, 1:21-cr-272— Sentenced to 60 days home detention; 24 months of probation after spending *one hour* inside the Capitol, scaled the walls on the Upper West Terrace to gain access to the building, and made post-riot statements on social media boasting about his recent exploits and threatening that he would "be back".  Defendant sentenced on a violation of 40 U.S.C. §5104(e)(2)(G).

- *United States v. Cunningham*, 1:21-cr-603— Sentenced to 12 months of probation, including 3 months of home detention, after spending *an hour and a half* inside the Capitol, including entering the Office of the Speaker of the House.  Defendant sentenced on a violation of 40 U.S.C. §5104(e)(2)(G).

- *United States v. Wood*, 1:21-cr-223— Sentenced to 3 years of probation, including 12 months of home detention, after spending *eighty minutes* inside the Capitol and scaling the media tower, encouraged others to move forward into the building, chased police officers, physically pushed against police officers, and went through the Offices of the Speaker of the House.  The defendant was convicted of six offenses—a mixture of both felonies and misdemeanors

- *United States v. Gordon*, 1:21-cr-099— Sentenced to 36 Months of Probation, including 90 days of home detention, after spending *one hour* inside the Capitol.  Gordon also made statements prior to January 6 that he welcomed violence at the Capitol and, once there, was part of a crowd that pushed its way past a line of police officers.  In the days that followed, Gordon made statements bragging about his participation in the riots and never expressed remorse for his behavior. Defendant sentenced on a violation of 40 U.S.C. §5104(e)(2)(G).

Again, although Mr. Ward's conduct at the Capitol was inexcusable, his behavior was

non-violent—and arguably far less disruptive than many of the defendants detailed above.

Moreover, Mr. Ward's conduct is plainly distinguishable from those cases selected and

highlighted by the government in support of its' sentencing recommendation of 14 days

incarceration, Dkt. 16, pg. 12:

> "*United States v. Savannah McDonald*, 21-CR-429, this Court sentenced to 21 days of incarceration a defendant who observed and cheered when a mob of rioters overran police on the Upper West Terrace Staircase, entered the U.S. Capitol building despite having been sprayed with tear gas three times by police officers, entered through the Senate Fire Door less than 20 seconds after it was opened by other rioters and spent approximately 40

minutes inside the U.S. Capitol building on January 6 while taking videos bragging about being the only girl to make it to the Senate and having been tear gassed by police officers."

Here, Mr. Ward did not engage in a clash with police that required him to be tear-gassed three times by police.  However, more importantly, Mr. Ward did not (unlike the defendant in *McDonald*) brag on social media regarding his actions while at the Capitol.

"*United States v. Derek Sulenta*, 22-CR-340, Judge Chutkan sentenced to 14 days of incarceration a defendant who spent 47 minutes inside the U.S. Capitol building and bragged on social media that day about "breach[ing] the capital (sic) building" and called the events "wild.""

Again, Mr. Ward did not brag or boast about his conduct on January 6, unlike the defendant in *Sulenta*, but instead has shown repeated and consistent remorse for his conduct throughout this process.

"*United States v. Tammy Bronsberg*, 21-Cr-144, Judge Walton sentenced to 20 days' incarceration a defendant who entered Capitol after seeing tear gas and rioters breaking into the doors. The defendant entered the Senate Fire Door near the Parliamentarian's office at about 2:46 p.m., four minutes after that location was first breached (which the defendant observed). Although the defendant exited the Capitol 30 seconds later, she then entered the Capitol a second time through the Senate Wing Door and remained inside for 10 minutes. During this, the defendant entered Senate Conference Room S145 and drank alcohol while watching riot police attempt to remove others from building. Post-arrest, the defendant posted to Facebook that she would "do it again." The defendant had a 30-year-old DUI conviction, a conviction in 2017 for possession of drug paraphernalia, and a disorderly conduct conviction in 2017."

Unlike the defendant in *Bronsberg*, Mr. Ward did not try to re-enter the Capitol once he left, did not consume alcohol while at the Capitol—or any other time during January 6—and, yet again, did not boast or brag on social media and did not threaten to engage in the same conduct "again" in the future.

To avoid unwarranted disparities, this Court should not lump Mr. Ward's conduct in with some of the more serious offenders but instead should consider his relatively minor role and sentence him accordingly.

27

**CONCLUSION**

As such, for the aforementioned reasons, Mr. Ward respectfully requests that this Court impose a probationary sentence accompanied by a reasonable restitution order.  Should this Court nevertheless impose a period of active incarceration, Mr. Ward respectfully requests a judicial recommendation to a facility near Rockland/Orange Counties, New York.  A probationary sentence would protect the community, promote respect for the law, and deter future crime by imposing consequences for Mr. Ward's behavior while recognizing his acceptance of responsibility and his role in the offense as compared to others.

Respectfully submitted,

SEAN WARD,
By Counsel

_____/s/_____
Zachary A. Deubler, Esq. (D.C. Bar # 25432)
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, 1st Floor
Alexandria, VA 22314
(703) 684-7908 (T)
(703) 649-6360 (F)
zach@carmichaellegal.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 23rd day of November 2023, a true and accurate of the foregoing was served on all counsel of record via the Court's Electronic Filing System.  I further certify that a copy was also sent by e-mail to Vimaris James, Probation Officer, at Vimaris_James@vip.uscourts.gov.

_____/s/_____
Zachary A. Deubler, Esq.